IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GENE FINKE,                                    )
                                               )
                    Plaintiff,                 )
                                               )
vs.                                            )        Case No. 2:19-cv-02056
                                               )
                                               )        Jury Trial Demanded
THE ENSIGN GROUP, INC *et al*                  )
                                               )
                    Defendants.                )

## PLAINTIFF'S MOTION TO STRIKE LAIRD WASHBURN'S RULE 30(E) ERRATA SHEET

Directly at issue in this case is: (1) why Gene Finke fell at his skilled nursing facility – Healthcare Resort of Shawnee – causing him to sustain a left distal fibula fracture and medial malleolus fracture;"[1] and (2) what legal entities were responsible for ensuring Healthcare Resort of Shawnee provided the minimally acceptable standard of care.  Plaintiff contends The Ensign Group, Inc.; Ensign Services, Inc.; Gateway Healthcare, Inc., and the Healthcare Resort of Shawnee are liable for the operation, management and negligence at the nursing home, and as a result, Mr. Finke's injuries through direct, alter ego, and joint venture liability.  *See generally* Doc. No. 4.  At bottom, what entities are legally responsible for the provision of medical care at the Healthcare Resort of Shawnee is a hotly contested and material issue in this case.

---

[1] *See* Doc. No. 4 at ¶2.

This motion follows: (1) the deposition of the administrator at Healthcare Resort of Shawnee – Laird Washburn[2] – where he made admissions regarding Ensign Services, Inc.'s involvement in the operation of the nursing home; and (2) defense counsel's subsequent submission of an errata sheet[3] under Fed.R.Civ.P. 30(e)(1) purporting to materially alter that testimony.  Mr. Washburn's testimony is critical as he was the nursing home administrator at the time of Mr. Finke's injury and therefore "responsible for management of the facility."  42 CFR § 483.70(d)(2)(ii).[4]  For that reason, the changes in Mr. Washburn's testimony are material and improper.

---

[2] Attached as Exhibit A.

[3] Attached as Exhibit B.

[4] 42 CFR § 483.70(d)(2) states in full: "The (1) The facility must have a governing body, or designated persons functioning as a governing body, that is legally responsible for establishing and implementing policies regarding the management and operation of the facility; and (2) The governing body appoints the administrator who is - (i) Licensed by the State, where licensing is required; (ii) Responsible for management of the facility; and (iii) Reports to and is accountable to the governing body."  Skilled nursing facilities sign under penalty of perjury three documents requiring them to abide by the applicable federal regulations.  Form CMS-855A is the Provider Agreement signed by all nursing facilities in order to establish eligibility to receive reimbursement from Form CMS-855A contains the following certification: "I understand that *payment of a claim by Medicare* is conditioned upon the claim and the underlying transaction *complying with such laws, regulations, and program instructions* (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's *compliance with all applicable conditions of participation* in Medicare." CMS-855A at 37, ¶ 3 (emphasis added).  In order to receive Medicare and Medicaid payments, a nursing facility must also sign a Health Insurance Benefit Agreement, Form CMS-1561. 42 U.S.C. § 1395cc. The Agreement contains the following certification: *In order to receive payment* under title XVIII of the Social Security Act [42 U.S.C. § 1395cc], [Name of the nursing home inserted here], as the provider of services, agrees to conform to the provisions of section of [sic] 1866 of the Social Security Act *and applicable provisions in 42 C.F.R.* Form CMS-1561 (emphasis added).  All Medicare providers also must submit cost reports annually. Cost reports contain the following certification provision: I further certify that I am familiar with *the laws and regulations regarding the provision of health care services,* and that the *services identified in this cost report were provided in compliance with such laws and regulations.* (emphasis added).

## LEGAL STANDARD

Rule 30(e) governs deposition errata sheets.  *See* Fed.R.Civ.P. 30(e)(1). That rule allows a deponent to review the transcript and "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." *Id.*  The changes must be submitted within 30 days after the transcript or recording is available. *Id.*  The 30-day rule is "mandatory." *Cappell v. Dep't of Army*, Sec., 2014 WL 5782389, at *1 (D. Kan. 2014).  Changes outside that window are not allowed. *See id.*[5]

"The Tenth Circuit has adopted a restrictive view of the deposition changes that can be made pursuant to Fed.R.Civ.P. 30(e), and takes a dim view of substantive alteration of deposition testimony: 'We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony.'" *Price v. City of Wichita*, No. 12-1432-CM-DJW, 2014 WL 289453, at *6 (D. Kan. Jan. 27, 2014) (quoting *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002)). Indeed, the Tenth Circuit held in *Garcia*:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

299 F.3d 1242 n.5.  "A change is material if it bears on an essential element of a claim or defense." *Price*, 2014 WL 289453, at *7 (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)).  This district explained in *Price*:

---

[5] Laird Washburn's deposition occurred on February 7, 2020.  The errata sheet was not provided until May 11, 2020 – almost three months after the deposition.  It is true that Plaintiff's counsel granted defendant's counsel extensions to provide the errata sheet.  Plaintiff takes no position as to whether those informal extensions are sufficient to circumvent the text of Fed. R. Civ. P. 30(e)(1) and the holding in *Cappell*, 2014 WL 5782389 at *1.

The Tenth Circuit in *Burns v. Board of County Commissioners* has held that Rule 30(e) deposition corrections should be treated the same as sham affidavits and evaluated under the factors set forth in *Franks v. Nimmo*.  In *Burns*, the court applied the following factors in evaluating material changes to deposition testimony: whether the deponent was cross-examined at his deposition, whether the corrections were based on any newly-discovered evidence, and whether there was confusion at the deposition that the corrections would need to be clarified

*Id.*

## ARGUMENT

Mr. Washburn's errata sheet is nothing more than the equivalent of a sham affidavit seeking to correct damaging material admissions contained in his deposition testimony regarding the involvement of Ensign Services, Inc., in the operation and management of the Healthcare Resort of Shawnee.   Indeed, Plaintiff has alleged that Ensign Service, Inc, "operated, managed, maintained, and/or controlled – in whole or in part – [Healthcare Resort of Shawnee] – which is a Kansas licensed nursing home," i.e., that it was involved in the provision of nursing care.   *See* Doc. No. 4 at ¶11.  Ensign Services, Inc., has denied this allegation and that entity's involvement will certainly be the subject of a dispositive motion.   Plainly, this future dispositive motion served as the motive for Mr. Washburn's changes to his deposition testimony made at the direction of counsel.[6]

---

[6] Arguably, the submission of Mr. Washburn's errata sheet by defense counsel is a sanctionable offense under Rule 11.  Plaintiff has not yet determined whether to seek sanctions for this dishonest and self-serving conduct.

Mr. Washburn testified during his deposition that (1) Ensign Services provided "consulting . . . clinical services" (2) "nursing services" were "provided" by Ensign Services; and (3) individuals from Ensign Services came into the nursing home who "were in nursing."   Ex. A at 11:7-15; 19:3-12; 19:20-25; and 21:1.   Now, after consulting with his attorney for three months, Mr. Washburn says Ensign Services provided only "non-clinical back office services;" he is "not aware of any" clinical services provided by Ensign Services; and that any references to "nursing" regarding Ensign Services should be deleted from his sworn testimony.[7]  Ex. B.

Here, Mr. Washburn's lawyer chose not to cross examine him and stated after a break to confer with his client: "We have no questions at this time.  We will read and sign."  Ex. A 48:18-19. Mr. Washburn's purported changes to his sworn testimony are catalogued as follows:

| Page/Line | Original Testimony | Corrected Testimony | Reason for Change |
|---|---|---|---|
| pg. 11, ln 9-11- | 7.  Q.   Do they [Ensign Services] provide any sort of 8.  clinical consulting?<br>9.  A.   They'll provide clinical -- I wouldn't call<br>10.  it "consulting," but they do have clinical services.<br>11.  Yes. | No, it's my understanding, according to contract, Ensign Services provides the facility specific non-clinical back office services." | Response was incorrect based on my subsequent review of the Independent Consulting Services Agreement (ICSA) between ESI and the Facility. |
| Pg. 11, beginning ln 14 - | 12.  Q.   What are -- What are the clinical services<br>13.  that they provide?<br><br>14.  A.   I couldn't speak to that.  I never really<br>15.  worked in that. | "I couldn't speak to that" I'm not aware of any." | Clarification of response. |

---

[7] Mr. Washburn's other purported corrections relate to the manner in which Ensign Services, Inc., asserted control over the nursing who and what entity Christopher Christensen served as Chief Executive Officer.  Each of these corrections are equally material and should be stricken.

| | | | |
|---|---|---|---|
| Pg. 18., ln 11 – | 1. Q.   So was there anyone from Ensign Services<br>2.  that said, hey, you -- you know, we have a contract<br>3. with these four nursing homes in Kansas.  We'd like<br>4. y'all to get together and talk about best practices?<br>5. Anything like that happen?<br>8. THE WITNESS:  I mean, we had resources from<br>9. Ensign Services.  So, yes, at times, Ensign Services<br>10. would say, hey, some of you are having the same issues.<br>11. And so they would say, yeah, let's gather together and<br>12. talk about those issues.  So, yes, that would happen at<br>13. times.  The main person that would direct this would<br>14. be -- would have been Dave Jorgensen. | "and it would be recommended that the facilities get together and talk about those issues." | Clarification of response. |
| Pg. 18., ln 22 – | 19. Q.    Was there ever any individuals from Ensign<br>20. Services that would come into the building while you<br>21. were administrator at The Healthcare Resort of Shawnee?<br>22. A. Yes. | "yes" should read – "individuals, who we knew as resources, would come to the building but I'm not sure if they were employed by Ensign Services." | Clarification of response. |

| | | | |
|---|---|---|---|
| Pg. 19, ln 9- 10 – | 3. Q.   What -- what -- That's fine. What -- what<br>4. positions -- What titles of positions of people from<br>5. Ensign Services would come into your building during<br>6. your time as administrator?<br>7. A.   Well, it would work that if we needed<br>8. something or wanted some help, then we would reach out<br>9. to a specific area, whether it was HR or accounting or<br>10. nursing.  And whichever department felt like they<br>11. needed some additional assistance or guidance, they<br>12. would reach out.  Those services are provided. | Delete "…or nursing." | Clarification of response based on review of ICSA |
| Pg. 19, ln 24  - | 20. Q.   So nobody at Ensign Services had titles?<br><br>23. THE WITNESS:  They just didn't have titles.<br>24. They -- They worked -- They were in nursing.  They were<br>25. in HR.  They were -- That's where -- there wasn't a<br>1. title.  They were -- We called -- | Delete "they were in nursing." | Clarification of response based on review of ICSA. |
| Pg. 24, ln 24 – | 19. Q.   Do you know who Chris Christensen is?<br>20. A.   Do you mean Christopher?<br>21. Q.   Sure.  Christopher Christensen.<br>22. A.   Yes.<br>23. Q.   Who's that?<br>24. A.   He's the CEO of -- of Ensign Services. | "He was the CEO" | Clarification of response. |

As described above, whether or not Ensign Services, Inc., provided nursing or clinical services to the Healthcare Resort of Shawnee is a disputed issue because if they did then they could be found liable for Mr. Finke's injuries.   For that reason, defense counsel has continually asserted Ensign Services, Inc., should not be a party to this case.   In fact, upon receiving the Complaint defense counsel for Ensign Services, Inc., wrote to Plaintiff's counsel and stated:

> Also, please let me know if you are willing to drop Ensign Group, Inc., Ensign Services, Inc., and Gateway Healthcare, Inc. from the case.  I will verify this, but it is my understanding that Maple Hills Healthcare, Inc. is the proper defendant for the allegations concerning these entities.

In other words, defense counsel for Ensign Services was aware at the time of Mr. Washburn's deposition that the involvement of that entity in the provision of healthcare at the nursing home was a central issue in the case.   Nonetheless, defense counsel chose not to cross examine Mr. Washburn after listening to his testimony.   Instead, defense counsel sought to treat Mr. Washburn's deposition as – "a take home examination" – in the manner expressly rejected by the Tenth Circuit in *Garcia,* 299 F.3d at 1242 n. 5.

Put simply, the law in this district establishes that an errata sheet – like Mr. Washburn's – should be stricken where there is no cross examination and "clarification" is utilized as the basis to change the sworn testimony.[8]   For these reasons, all of Mr. Washburn's errata sheet should be stricken.

---

[8] *See Price*, 2014 WL 289453, at *7 ("'McKee makes only two corrections to his June 26, 2013 deposition testimony in his errata sheet. He provides an explanation for his first change to the month of when he first learned about the lawsuit. For his second change, his stated sole reason is "clarification." Under the *Burns* factors, it does not appear that McKee was cross-examined on this issue at his deposition, at least based upon the limited number of his deposition pages provided to the Court. There is no suggestion that McKee's correction was based upon new evidence. Finally, McKee's original deposition testimony does reflect any confusion at the deposition that would need clarification. Considering the factors set forth in *Burns,* the Court finds that McKee's errata sheet change to his original deposition testimony "I'm sure we had a conversation at that point' should be disregarded."'").

WHEREFORE, Plaintiff respectfully requests that the Court order Laird Washburn's errata sheet stricken, and for such other relief as the Court deems just and proper.

Respectfully submitted,

THE STEELE LAW FIRM

/s/ Jonathan Steele
Jonathan Steele          MO # 63266
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.754.6473
E-mail: jonathan@jsteelelawfirm.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the above and foregoing document was sent to all counsel of record via the Court's ECF system on May 12, 2020:

**ATTORNEYS FOR DEFENDANTS**

*/s/ Jonathan Steele*
**ATTORNEY FOR PLAINTIFF**