# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF KANSAS

3                     -ooOoo-

4    GENE FINKE,                   :

5              Plaintiff,          :

6    vs.                          : Case No. 2:19-cv-02056

7    THE ENSIGN GROUP, INC.    : Jury Trial Demanded

8    et al,
                                   :
9              Defendants.
                                   :
10   _____

11

12        VIDEO DEPOSITION OF LAIRD WASHBURN

13

14        Taken on Friday, February 7, 2020

15             At 8:22 a.m.

16

17

18        At ADVANCED REPORTING SOLUTIONS
               159 West Broadway,
19                Suite 100
            Salt Lake City, Utah 84111
20

21

22

23

24
   Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC
25

```
 1              A P P E A R A N C E S

 2

    For the Plaintiff:
 3
            Johnathan Steele (present via videoconference)
 4          THE STEELE LAW FIRM
            2345 Grand Blvd
 5          Suite 750
            Kansas City, Missouri 64108
 6          jonathan@jsteelelawfirm.com
            (816) 754-6473
 7

 8  For the Defendants THE ENSIGN GROUP, INC.; ENSIGN
    SERVICES, INC.; GATEWAY HEALTHCARE, INC.; MAPLE HILLS
 9  HEALTHCARE:

10          Bret A. Clark
            SCHARNHORST AST KENNARD GRIFFIN, PC
11          1100 Walnut
            Suite 1950
12          Kansas City, Missouri 64106-2143
            tscharnhorst@sakg.com
13          (816) 268-9400

14
    For the Defendants HEARTLAND REHABILITATION HOSPITAL,
15  LLC and POST ACUTE MEDICAL, LLC:

16          Shannon M. Rulo
            WIEDNER & MCAULIFFE, LTD.
17          8000 Maryland Avenue
            Suite 550
18          St. Louis, Missouri 63105
            czvaughn@wmlaw.com
19          (314) 721-3400

20

21                     -ooOoo-

22

23

24

25
```

1                    I N D E X

2  EXAMINATIONS                                          PAGE

3   Examination By Mr. Steele........................... 5

4

5                  E X H I B I T S

6  EXHIBIT NO.            DESCRIPTION                    PAGE

7    Exhibit No. 1  Code of Conduct..................... 38

8

9                      -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   February 7, 2020                           8:22 a.m.

 2                  P R O C E E D I N G S

 3                        -o0o-

 4

 5           VIDEOGRAPHER:  Good morning.  We are going

 6   on record.  This is the video recorded deposition of

 7   Laird Washburn in the matter of Gene Finke versus

 8   Ensign Group, et al.  This deposition is taking place

 9   at Advanced Reporting Solutions in Salt Lake City,

10   Utah, on February 7th, 2020 at 8:22 a.m.

11           My name is Stephanie Largin, and I am the

12   videographer with Advanced Reporting Solutions.  And

13   our court reporter is Abby Johnson.  All video and

14   audio -- audio recording will be taking place unless

15   all counsel agree to go of record.

16           Will the counsel please state their names

17   and who they represent for the video record?

18           MR. STEELE:  Jonathan Steele for the

19   Plaintiff.

20           MS. RULO:  Shannon Rulo for Rehab Hospital.

21           MR. CLARK:  Brett Clark for Defendant Maple

22   Hills Healthcare, Ensign Services, Ensign Group and

23   Gateway Healthcare.

24           VIDEOGRAPHER:  Will the court reporter

25   swear in the witness?
```

1    Thereupon --

2                      LAIRD WASHBURN,

3      was called as a witness, and having been first duly

4     sworn to tell the truth, the whole truth, and nothing

5              but the truth, testified as follows:

6                         EXAMINATION

7    BY MR. STEELE:

8         Q.    Good morning, sir.  Thank you for agreeing

9    to let me take your deposition today.  As I told

10   Mr. Clark, I hope that we won't be here very long.  My

11   name is Jonathan Steele.  I represent Gene Finke in a

12   lawsuit that he's filed against Maple Hills Healthcare,

13   which I think was also The Healthcare Resort of Shawnee

14   at the time.

15              And have you ever had your deposition taken

16   before?

17        A.    Yes.

18        Q.    In what context, like in a lawsuit like

19   this or something different?

20        A.    Similar to this.

21        Q.    Okay.  So -- And who's your current

22   employer?

23        A.    I work for Ensign Services.

24        Q.    And what's your role there?

25        A.    Title is director of business development.

1   I manage our assets, mostly physical plant, overseeing

2   remodeling and -- and any kind of construction

3   projects.

4        Q.    And it's my understanding that at one time

5   you were the nursing home administrator at Maple Hills

6   Healthcare in Shawnee, Kansas; is that accurate?

7        A.    Yeah.   Shawnee Mission?   The Healthcare

8   Resort of Shawnee Mission, yes.

9        Q.    Yes.   Okay.   And you are a licensed

10  healthcare administrator?

11       A.    Yes.

12       Q.    How long have you held that license?

13       A.    In which state?

14       Q.    Kansas.

15       A.    I'm no longer a licensed administrator in

16  Kansas.

17       Q.    When did you obtain your Kansas nursing

18  home administration license?

19       A.    I -- I can't recall.   I think it was 2015.

20       Q.    Okay.   So Mr. Clark is -- is your lawyer,

21  and so I'm sure he will have some objections to my

22  questions.   Ms. Rulo may also.   So one -- one thing

23  I -- I think that will help everybody is the court

24  reporter can't record more than one person talking.   So

25  maybe try and wait a beat if Mr. Clark or the other

```
 1  lawyer makes an objection.  Go ahead and let them
 2  finish their objection for the record.  And then unless
 3  he instructs you not to answer the question, I would
 4  ask that you go ahead and answer the question.  Does
 5  that sound fair?
 6      A.    Yes.
 7      Q.    Okay.  Any time you want to take a break --
 8  Like I said, I don't think we'll be here too long, but
 9  any time you want to take a break is totally fine.
10            Let me ask you this; when did you become
11  the nursing home administrator at The Healthcare Resort
12  of Shawnee Mission?
13      A.    To the best of my recollection, it was in
14  late summer of 2017.
15      Q.    And when did you leave that position?
16      A.    I truly, honestly can't remember, but it
17  wasn't much longer after that.
18      Q.    Okay.  Would it have been Christmastime or
19  the end of 2018 -- or 2017?  Excuse me.  Or just a few
20  months?  Can you give me just an approximation?
21      A.    Yeah.  I would say it was before 2018.  It
22  was some time in 2017 to the best of my recollection.
23      Q.    Okay.  And that's fine.  This isn't -- This
24  isn't a memory contest.  So if you don't know the
25  answer to one of my questions, that's -- that's totally
```

1    okay.  Just let me know.

2              So The Healthcare Resort of Shawnee

3    Mission, that's a skilled nursing facility; is that

4    right?

5         A.    Yes.

6         Q.    Okay.  As nursing home administrator, can

7    you describe to me, what is a skilled nursing facility?

8         A.    That's a -- could be a long answer, but

9    it's -- Skilled nursing is to care for senior or other

10   population that are -- have acute needs or chronic

11   illnesses.

12        Q.    Okay.  So is it -- Is -- So the skilled

13   nursing facility is caring for people that can't care

14   for themselves; is that fair?

15             MR. CLARK:  Objection.  Misstates his

16   testimony.  You can answer it, if you can.

17             THE WITNESS:  I think it's more than that.

18   BY MR. STEELE:

19        Q.    Okay.  Explain.

20        A.    You'll have individuals that come there

21   that -- from the hospital that just need additional

22   care before they're discharged to home.

23        Q.    Right.  So people can't care for

24   themselves; right?  They need help from the skilled

25   nursing facility; correct?

1    A.    Yeah.  They -- They can care for portions

2  or part, but there are some things that they are not

3  allowed to do at home.

4    Q.    So they can't completely care for

5  themselves?  They need the help of the people at the

6  skilled nursing facility; correct?

7    A.    Yeah.  They need care at the facility.

8    Q.    When did you first -- Let me ask it this

9  way; was the administrator's position at The Healthcare

10  Resort of Shawnee, was that your first position at that

11  skilled nursing facility?

12    A.    Yes.

13    Q.    Okay.  Where did you work before that?

14    A.    Ensign Services.

15    Q.    All right.  What was your position at

16  Ensign Services before that?

17    A.    I helped with the recruiting of --

18  recruiting for various positions.

19    Q.    What kind of positions?

20    A.    I would help recruit administrators in

21  training, executive directors, rehab.

22    Q.    Walk me through -- What is that recruitment

23  process like from when you were working at Ensign

24  Services prior to your position at The Healthcare

25  Resort of Shawnee Mission?

1        A.     I'm sorry.  I couldn't understand that

2   question.  You'll have to forgive me.  My ears are

3   clogged, so I'm -- I can barely hear you at times.

4        Q.     That's totally okay.  And if you can't hear

5   me or you can't understand me or any of my questions

6   are confusing, please let me know.

7              But my question was; walk me through just

8   what that recruitment process was like in your position

9   as a recruiter at Ensign Services.  How did you go

10  about recruiting those individuals that you described

11  to me?

12       A.     Through various methods.  We would have

13  people contact us that were interested.  I would

14  actually attend conferences where I would actively help

15  with the recruiting process in the specific market by

16  contacting other executive directors and introducing

17  them to Ensign Services.

18       Q.     And describe to me, what is Ensign

19  Services?

20       A.     Ensign Services provides -- Through

21  contracts with facilities, we provide services to

22  skilled nursing and other facilities, health

23  facilities.

24       Q.     What kind of service -- What kind of

25  services?

1          A.     All -- All kind of backhouse services.

2   Facilities could use us for their HR.  In my case,

3   helping them recruit and find talent, accounting.

4   Anything you need to operate a facility, they would --

5   They'd sign a contract, and we'd provide those services

6   for them.

7          Q.     Do they provide any sort of clinical

8   consulting?

9          A.     They'll provide clinical -- I wouldn't call

10  it "consulting," but they do have clinical services.

11  Yes.

12         Q.     What are -- What are the clinical services

13  that they provide?

14         A.     I couldn't speak to that.  I never really

15  worked in that.

16         Q.     Okay.  Who hired you on as the

17  administrator at The Healthcare Resort of Shawnee

18  Mission?

19         A.     You have to forgive me.  Again, I'm trying

20  to recollect.  I think it was Brett Cook and -- Brett

21  Cook I think was who I interviewed me.  I think it was

22  Brett Cook.

23         Q.     And who is Brett Cook?

24         A.     He was the -- the ED at Topeka.

25         Q.     How was it that you became interested at

1  the position as administrator at The Healthcare Resort

2  of Shawnee Mission?

3       A.    I'm licensed, and I enjoy, you know, the

4  opportunity to work with people and work with

5  residents.  It's quite rewarding.

6       Q.    Right.  And you're -- So you're at Ensign

7  Services doing recruiting, and then you made the

8  decision to transition into administration in August of

9  2017.  What -- what led you to moving from Ensign

10 Services into administration?

11      A.    Just as I stated, I -- I thought it would

12 be fun.  I thought it would be rewarding, opportunity.

13      Q.    Did anyone at Ensign Services direct you or

14 point you in the direction of the administration

15 position at The Healthcare Resort of Shawnee Mission?

16           MR. CLARK:  Objection.  Vague.  You can

17 answer it, if you can.

18           THE WITNESS:  Not -- No.  Not really.  I

19 can't remember that.  So --

20 BY MR. STEELE:

21      Q.    So, you were there for a couple of months,

22 I guess, in the end of 2017.  Was there any particular

23 special areas or projects that you focused on during

24 your time as administrator at The Healthcare Resort of

25 Shawnee?

1      A.      Not that I can recall.

2      Q.      During your tenure, did -- did things get

3  better?  Did they get worse?  Did they stay the same?

4              MR. CLARK:  Objection to form.  Vague.  You

5  can answer it, if you can.

6              THE WITNESS:  I can't answer that.

7  BY MR. STEELE:

8      Q.      You don't have any opinion as to whether

9  the skilled nursing facility that you were the

10 administrator of, whether anything got better, got

11 worse or got -- or stayed the same?

12             MR. CLARK:  Same objection.  You can answer

13 it, if you can.

14             THE WITNESS:  I'm just saying is that -- I

15 felt like I performed my duties.  And -- And we were

16 providing good -- great services and care.  So I did it

17 to the best of my ability.

18 BY MR. STEELE:

19     Q.      Who did you report to during your -- Who

20 did you report to during your time as administrator at

21 The Healthcare Resort of Shawnee?

22     A.      Well, mostly I spoke with Brett Cook who

23 was out at Topeka, the administrator there, and Dave

24 Jorgensen.

25     Q.      Who's Dave Jorgensen?

 1        A.    Dave Jorgensen is -- He would help with

 2   other facilities as well.  He was in a facility too,

 3   so --

 4        Q.    So you reported to another administrator at

 5   another nursing home?

 6        A.    Correct.

 7        Q.    So another administrator at another nursing

 8   home was your boss?

 9        A.    Yeah.

10        Q.    Okay.  Walk me through what your

11   interactions with Dave Jorgensen was during your time

12   as administrator.  What did he oversee?

13        A.    He -- He didn't really oversee anything.

14   He was more of a mentor, and I reached out to him.  You

15   asked who I spoke with, so he's someone that I knew

16   that --

17        Q.    I asked you who --

18        A.    -- reported --

19        Q.    Who was your boss?

20        A.    Brett Cook, Topeka --

21        Q.    Okay.

22        A.    -- as best I recall.

23        Q.    And Brett Cook -- And Brett Cook was the

24   executive director at a Topeka Skilled Nursing

25   Facility; is that right?

```
 1        A.      Correct.

 2        Q.      Okay.  And what --

 3                MR. CLARK:  Wait a second.  Wait a second,

 4    Johnathan.  He hadn't finished his answer yet.

 5                THE WITNESS:  Sorry.  You'll have to

 6    forgive me.  This was years ago, and it's confusing.

 7    Brett Cook had left, so it was Ben Likert was in

 8    Topeka.  I apologize.

 9    BY MR. STEELE:

10        Q.      So Ben Likert was the executive director at

11    Topeka --

12        A.      Yes.

13        Q.      -- during this time?  Is that what you're

14    telling me?

15        A.      Yes.

16        Q.      Okay.  And what did he oversee in your role

17    as administrator at The Healthcare Resort of Shawnee?

18        A.      What did he oversee; is that your question?

19        Q.      Yes.  Yes.

20        A.      Well, I -- I was the administrator.  So I

21    oversaw.  He -- He was just someone that I counseled

22    with and worked with.  The facility itself was my

23    responsibility.

24        Q.      Okay.  Sir, who was your boss?  Who did you

25    report to?
```

1        A.      Well I reported to the other administrators

2   in the area.  We kind of report to each other.

3        Q.      Okay.  So did you not have a boss?  Let me

4   ask you this; who could fire you?  Who had the

5   authority to fire you as administrator of The

6   Healthcare Resort of Shawnee?

7        A.      The other administrators in the area.

8        Q.      Okay.  All of them?  Did they -- I mean, in

9   what capacity?

10        A.      Well, they would -- If I wasn't performing,

11   yeah, they would come together and decide that I could

12   be fired.  So yeah, the other administrators in that

13   Kansas market.

14        Q.      Did they have regular meetings --

15        A.      Yes.

16        Q.      -- the other administrators?

17        A.      Yes.

18        Q.      And what were those meetings about?

19        A.      We'd get together.  We'd discuss best

20   practices, how we could improve care.

21        Q.      Was anybody else at these meetings other

22   than these administrators of these other facilities?

23        A.      I'm sorry.  I couldn't understand that

24   question.

25        Q.      Was anybody else at these meetings other

1   than these administrators of these other skilled

2   nursing facilities?

3        A.    Yeah.  The director of nursing would attend

4   as well.

5        Q.    From each of these other skilled nursing

6   facilities?

7        A.    Correct.

8        Q.    And how many of these other skilled nursing

9   facilities are there that would attend these meetings?

10       A.    I think there was five -- four.

11       Q.    And what is the relationship between those

12   four nursing homes?  What brought them to these

13   meetings together?

14       A.    We share services contracted with Ensign

15   Services, so --

16       Q.    Okay.  Who directed you to have these

17   meetings with these other three or four facilities?

18            MR. CLARK:  Objection.  Vague.  You can

19   answer, if you can.

20            THE WITNESS:  I don't know who directed it.

21   BY MR. STEELE:

22       Q.    Well, who told you to go to them?

23       A.    Well, again, when we talked with Ben Likert

24   and the rest of us.  That's why we did it.  We came

25   together to help better improve the operations.

1      Q.    So was there anyone from Ensign Services

2  that said, hey, you -- you know, we have a contract

3  with these four nursing homes in Kansas.  We'd like

4  y'all to get together and talk about best practices?

5  Anything like that happen?

6             MR. CLARK:  Objection to form.  You can

7  answer it, if you can.

8             THE WITNESS:  I mean, we had resources from

9  Ensign Services.  So, yes, at times, Ensign Services

10 would say, hey, some of you are having the same issues.

11 And so they would say, yeah, let's gather together and

12 talk about those issues.  So, yes, that would happen at

13 times.  The main person that would direct this would

14 be -- would have been Dave Jorgensen.

15 BY MR. STEELE:

16     Q.    Okay.  Do you know if Dave Jorgensen had

17 any title with Ensign Services?

18     A.    No.  I don't know what his title is.

19     Q.    Was there ever any individuals from Ensign

20 Services that would come into the building while you

21 were administrator at The Healthcare Resort of Shawnee?

22     A.    Yes.

23     Q.    Who were those people?

24     A.    I really couldn't tell you at this point.

25 It's been two years, but we'd have services all the

1  time.  They'd help our back of the house.  So, yes, but

2  I couldn't tell you specific names.

3       Q.    What -- what -- That's fine.  What -- what

4  positions -- What titles of positions of people from

5  Ensign Services would come into your building during

6  your time as administrator?

7       A.    Well, it would work that if we needed

8  something or wanted some help, then we would reach out

9  to a specific area, whether it was HR or accounting or

10 nursing.  And whichever department felt like they

11 needed some additional assistance or guidance, they

12 would reach out.  Those services are provided.

13      Q.    So I understand that you would reach out to

14 those departments.  And I'm asking you; what types of

15 individuals from those departments?  I mean, was there,

16 you know, a regional director?  Was there -- What

17 titles of someone, for example, from the HR would come

18 into your building and help you with HR?

19      A.    I -- There was no titles.

20      Q.    So nobody at Ensign Services had titles?

21           MR. CLARK:  Objection to form.  Misstates

22 his testimony.  You can answer it, if you can.

23           THE WITNESS:  They just didn't have titles.

24 They -- They worked -- They were in nursing.  They were

25 in HR.  They were -- That's where --  there wasn't a

1   title.  They were -- We called --

2   BY MR. STEELE:

3       Q.    How did you -- Oh, I'm sorry.  Go ahead.

4       A.    I said they were just resources.  That's

5   how.

6       Q.    And so there was a contract between Ensign

7   Services and The Healthcare Resort of Shawnee; correct?

8       A.    To the best of my knowledge, yes.

9       Q.    All right.  During your time as

10  administrator, did you ever review that contract?

11      A.    No.

12      Q.    Okay.  Did you, as administrator, have the

13  authority to fire Ensign Services?

14      A.    Yes.  At least I was told.  Yes.

15      Q.    Who told you that?

16      A.    Brett, I think.  No.  Ben.  Anyway, when I

17  talk to him -- Yeah.

18      Q.    So Ben Likert told you, you had the

19  authority to fire Ensign Services as a -- a contractor

20  during your time as administrator; is that right?

21      A.    No.  I wouldn't say Ben.  I don't know who.

22  I can't remember.  I just know we could if we wanted

23  to.

24      Q.    How do you know that?

25            MR. CLARK:  You can answer it, if you can.

```
 1              THE WITNESS:  I can't.  I don't know.  I
 2  can't remember.  I'm sorry, but I know we could.
 3  BY MR. STEELE:
 4       Q.    But you've never looked at the contract;
 5  right?
 6       A.    That's correct.
 7       Q.    Did you sign the contract?
 8       A.    No.
 9       Q.    So you don't know what's in the contract
10  then; correct?
11       A.    Correct.
12       Q.    Help me understand what a nursing home
13  administrator does.
14       A.    Oversees the operation.
15       Q.    What does that mean?  What does the
16  "operation" mean?
17       A.    It means the whole operation of the
18  facility.
19       Q.    So the nursing home administrator is
20  responsible for the whole operation of the facility; is
21  that right?
22       A.    Overseeing it, yes.
23       Q.    Kind of the buck stops with them?
24              MR. CLARK:  Objection.  Vague.  You can
25  answer it, if you can.
```

1          THE WITNESS:  I -- Yeah.  Well, it depends.

2  BY MR. STEELE:

3      Q.    What's it depend on?

4      A.    Well, a nursing home administrator is not a

5  licensed nurse.  I'm not a licensed therapist.  You

6  have a lot of professionals within that operation, and

7  they're responsible for their duties.  So --

8      Q.    Well, and that's what I'm trying to

9  understand.  You said you oversaw the operation of a

10  nursing home.  I'm trying to understand what the

11  "operation of a nursing home" means.

12          MR. CLARK:  Objection.  Overbroad.  Vague.

13  You can answer it, if you can.

14          THE WITNESS:  So you -- Restate the

15  question.  Let me see if I understand it.  I apologize.

16  What are you trying to ask?  I'm sorry.

17  BY MR. STEELE:

18      Q.    I believe you told me that the nursing home

19  administrator is responsible for the overall operation

20  of the nursing home.  Is that what you told me?

21      A.    Yes.  I think that's what I told you.

22      Q.    Okay.  And so that -- You stand by that,

23  that the nursing home administrator is the person

24  that's responsible for the overall operation of the

25  facility --

1        A.      Yes.

2        Q.      -- is that fair?

3        A.      Yes.

4        Q.      All right.  Do you know -- Who was on the

5   governing body at the Healthcare Resort of Shawnee

6   during your time as administrator?

7        A.      I wouldn't know.

8        Q.      Do you know what a "governing body" is?

9        A.      Not really.

10       Q.      Have you heard of the term "governing

11  body"?

12       A.      I've heard it.

13       Q.      Okay.  So what's your understanding of what

14  a governing body is?

15       A.      A group of individuals that oversee.  I --

16       Q.      Oversee what?

17       A.      I don't know the -- they're the governing

18  body of whatever that operation is they're governing.

19       Q.      Right.  So are you aware that the federal

20  regulations that governors skilled nursing facilities

21  require that the nursing home have a governing body

22  that is responsible for its operation?

23             MR. CLARK:  Objection to form.  You can

24  answer it, if you can.

25             THE WITNESS:  I'm sure there's an reg

1   there, but I'm not familiar with it.

2   BY MR. STEELE:

3       Q.    Okay.  Are you aware that a governing body

4   is the person that hires and fires the administrator at

5   a nursing home?

6       A.    No.  I wasn't aware of that.

7       Q.    Okay.  So for the two to four months that

8   you were the administrator at The Healthcare Resort of

9   Shawnee, you were responsible for the nursing home's

10  overall operation; is that correct?

11      A.    Yes.

12      Q.    Do you know who the corporate directors

13  were at Maple Hills Healthcare of The Healthcare Resort

14  of Shawnee Mission?

15            MR. CLARK:  As of what period of time?

16  BY MR. STEELE:

17      Q.    During your time as administrator.

18      A.    No.

19      Q.    Do you know who Chris Christensen is?

20      A.    Do you mean Christopher?

21      Q.    Sure.  Christopher Christensen.

22      A.    Yes.

23      Q.    Who's that?

24      A.    He's the CEO of -- of Ensign Services.

25      Q.    Did you know that he's also the corporate

1  director of The Healthcare Resort of Shawnee during

2  your time as administrator?

3              MR. CLARK:  Objection.  Lacks foundation.

4  He's already told you he doesn't know who was in that

5  position.  You can answer it, if you can.

6              THE WITNESS:  I did not know.

7  BY MR. STEELE:

8      Q.    Do you know who appointed Christopher

9  Christensen as the director of The Healthcare Resort of

10 Shawnee during your time as administrator?

11             MR. CLARK:  Objection to form.  You can

12 answer, if you can.

13             THE WITNESS:  No.

14 BY MR. STEELE:

15     Q.    Who is Gateway Healthcare?

16     A.    Gateway Healthcare, that's facilities in

17 the Midwest.  I couldn't tell you who it is, but I know

18 it's facilities in the Midwest.

19     Q.    What do you mean the "facilities in the

20 Midwest"?

21     A.    I mean, there's a group of facilities in

22 the Midwest, and together they were called Gateway.

23     Q.    Okay.  Was The Healthcare Resort of Shawnee

24 a part of Gateway Healthcare?

25     A.    I can't -- I don't know.

1      Q.     Are you aware that Gateway Healthcare owned

2  100 percent of The Healthcare Resort of Shawnee during

3  your time as administrator?

4      A.     No, I was not.

5      Q.     Do you know who was on the board at Gateway

6  Healthcare during your time as administrator?

7      A.     No.

8      Q.     Do you know who the corporate directors

9  were at Gateway Healthcare during your time as

10 administrator?

11     A.     No.

12     Q.     Do you know if there was a contract between

13 Gateway Healthcare and The Healthcare Resort of Shawnee

14 during your time as administrator?

15     A.     No.

16     Q.     You did tell me that there was a contract

17 between Ensign Services and Maple -- and The Healthcare

18 Resort of Shawnee; is that right?

19     A.     That's correct.

20     Q.     Who negotiated that contract on behalf of

21 The Healthcare Resort of Shawnee?

22     A.     I don't know.

23     Q.     During your time as administrator, did you

24 have any role in the preparation of the Healthcare

25 Resort of Shawnee's tax returns or financial

1  statements?

2      A.    No.

3      Q.    Who did?

4      A.    I don't know.

5      Q.    Are you aware that there is a revolving

6  credit agreement that provided funds to operate The

7  Healthcare Resort of Shawnee?

8      A.    No.

9      Q.    Do you know who negotiated the revolving

10  credit agreement that provided funds to operate the

11  Healthcare Resort of Shawnee during your time as

12  administrator?

13          MR. CLARK:  Objection to form.  Lacks

14  foundation.  Again, I already told you he wasn't aware

15  of it.  You can answer it, if you can.

16          THE WITNESS:  No.

17  BY MR. STEELE:

18      Q.    Do you know who signed the revolving credit

19  agreement on behalf of The Healthcare Resort of Shawnee

20  during your time as administrator?

21          MR. CLARK:  Same objection.  You can

22  answer, if you can.

23          THE WITNESS:  No.

24  BY MR. STEELE:

25      Q.    Did you ever review the terms of the

1  revolving credit agreement that provided funds to

2  operate The Healthcare Resort of Shawnee during your

3  time as administrator.

4            MR. CLARK:  Same objection.  You can

5  answer, if you can.

6            THE WITNESS:  No.

7  BY MR. STEELE:

8       Q.    Let me ask you this; how does -- how does

9  The Healthcare Resort of Shawnee generate revenue

10  during your time as administrator?

11      A.    You want to know how we generated revenue?

12      Q.    Yes.

13      A.    By providing services to the residents that

14  were in our facility.

15      Q.    Right.  And so break it -- break it down

16  for me.  What are the source -- What are the payor

17  sources at The Healthcare Resort of Shawnee Mission

18  during your time as administrator?

19      A.    Well, to the best of my recollection,

20  Medicare, Medicaid and HMO and private pay.

21      Q.    All right.  Where did those dollars go when

22  The Healthcare Resort of Shawnee Mission was getting

23  reimbursed for the care that it was providing its

24  residents?

25      A.    To be honest, I don't know.  That was the

```
 1  business office manager.
 2       Q.    Was there a bank account for The Healthcare
 3  Resort of Shawnee?
 4       A.    I am -- Yes.  I'm sure there was.
 5       Q.    Did you know what bank the bank account
 6  was?
 7       A.    No.
 8       Q.    So, you didn't know where the funds were
 9  going that were coming in to reimburse your nursing
10  home that you oversaw during your time as
11  administrator?
12            MR. CLARK:  Objection.  Argumentative.  You
13  can answer the question, if you can.
14            THE WITNESS:  Yeah.  I didn't know.
15  BY MR. STEELE:
16       Q.    I take it then you were not a signatory on
17  the bank account that the funds that were coming into
18  The Healthcare Resort of Shawnee during your time as
19  administrator?
20       A.    To the best of my recollection, I was not a
21  signee -- signor.
22       Q.    Do you know who was a signor?
23       A.    No.  I couldn't tell you for sure.
24       Q.    Have you ever heard of the term "lockbox
25  account"?
```

1        A.      I think.

2        Q.      What's your understanding of what a lockbox

3    account is?

4        A.      Not a clue.

5        Q.      Are you aware that all of The Healthcare

6    Resort of Shawnee's Medicare and Medicaid payments

7    during your time as -- as your time as administrator

8    were swept from the operating account into a lockbox

9    account?

10       A.      No.  I was not aware of that.

11       Q.      Are you aware that all of the Medicare and

12   Medicaid payments that were reimbursing The Healthcare

13   Resort of Shawnee during your time as administrator

14   were swept from the operating account into a lockbox

15   account at the direction of Ensign Services?

16               MR. CLARK:  Objection.  Lacks foundation.

17               THE WITNESS:  I wasn't aware.

18   BY MR. STEELE:

19       Q.      As an administrator -- I guess during --

20   during your time as administrator of the Healthcare

21   Resort of Shawnee, were stock options available to you?

22       A.      No.

23       Q.      You weren't -- They weren't?  Nobody ever

24   told you that?

25       A.      No.  Not while I was there.

1          Q.     Have you ever heard of -- Well, let me ask

2     this; as administrator -- during your time as

3     administrator at the Healthcare Resort of Shawnee, were

4     you eligible for any sort of incentives?

5          A.     Yes.

6          Q.     What types of incentives were you eligible

7     for?

8          A.     If -- I was there for a brief period

9     because they were waiting for another administrator to

10    come in.  So they just asked me to make sure that we

11    continued a good operation.  I can't recall what it

12    was, but -- but there was some incentives.

13         Q.     Who asked you to continue the good

14    operations?

15         A.     Dave Jorgensen, Ben Likert and the other

16    administrators in the area.

17         Q.     And so I take it then you that came to the

18    nursing home to -- from what you just told me -- to

19    kind of fill in the gap from one administrator to

20    another; is that accurate?

21         A.     That's correct.

22         Q.     Okay.  So is this happenstance then that

23    you decided you wanted to become an administrator and

24    they just happened to have this opening at The

25    Healthcare Resort of Shawnee when you decided to make

1  that move?

2        A.    Well, I didn't become administrator.  I

3  already was one, and I thought it would be fun.  I

4  enjoyed staff there.  Is that what you were asking?

5        Q.    Well, it -- it sounded like that -- Let me

6  ask you this; why was Dave Jorgensen interested in the

7  operations of The Healthcare Resort of Shawnee?

8              MR. CLARK:  Objection.  Lacks foundation.

9  Calls for speculation.  You can answer it, if you can.

10             THE WITNESS:  I can't answer that.  You'd

11 have to ask him.

12 BY MR. STEELE:

13       Q.    All right.  Have you ever reviewed the

14 corporate integrity agreement entered into by the

15 Ensign Group?

16       A.    The what?

17       Q.    The corporate integrity agreement.

18       A.    No, I have not.

19       Q.    Have you ever heard of the corporate

20 integrity agreement?

21       A.    I have.

22       Q.    What is -- What have you heard about the

23 corporate integrity agreement?

24       A.    That we have one.  And -- That was --

25       Q.    You ever receive any training on the

1  corporate integrity agreement?

2       A.    Not that -- I wouldn't say on the corporate

3  integrity agreement, no.  We've had -- I was -- I had

4  to do some compliance training prior to that to make

5  sure that we understood the -- You know, you have to go

6  through a lot of in-services and training prior to

7  going to the facility.  So I had to do that.  Which was

8  talking about corporate integrity and -- And -- but

9  that's all I know is through compliance.

10      Q.    Who provided that training to you?

11      A.    I couldn't recall.

12      Q.    Where did you go for that training?

13      A.    At the facility itself.

14      Q.    Okay.  Was it on the computer?  Was it in

15  person?

16      A.    There was some in person, and then there

17  was some on the computer.

18      Q.    All right.  How did the process for

19  completing the training on the computer go?

20      A.    You'd have to log on.  You would have to go

21  through a series of videos and training.  And at the

22  end, you would have to take a test.

23      Q.    What -- What would you log onto?

24      A.    A computer.

25      Q.    Right.  Where was the training program?

1  Was there a training system that you had to log into,

2  an intranet, anything like that?

3        A.    Yeah.  It was on a -- It was -- You just

4  log on to the computer, and it was in the facility's --

5  You' go into a portal.  You'd log on.  It gave you a

6  log-on and a password, and you went to a portal.

7        Q.    Whose portal?

8        A.    The facility has it, and it was part of

9  Ensign Services.

10       Q.    Okay.  But you told me that you'd heard of

11 the corporate integrity agreement signed by the Ensign

12 Group; is that right?

13            MR. CLARK:  Objection to form.  Misstates

14 his prior testimony.  You can answer it, if you can.

15            THE WITNESS:  Yeah.  I've heard of it.

16 BY MR. STEELE:

17       Q.    And do you know why a corporate integrity

18 agreement signed by the Ensign Group would apply to The

19 Healthcare Resort of Shawnee Mission?

20       A.    No.  Sorry.

21       Q.    Have you heard of the Ensign Group?

22       A.    Yes.

23       Q.    Who are they?

24       A.    Nobody.  I mean, it was a name people had,

25 but it doesn't apply to anything.

1        Q.     Are you aware that the Ensign Group is a

2   company?

3        A.     I was not aware there was a company.  I

4   mean, I'm familiar with Ensign Services.  And I'd heard

5   about --

6        Q.     No.  My question is about the Ensign Group.

7        A.     Oh, I couldn't speak to that.

8        Q.     So have you ever heard of the Ensign Group,

9   Inc.?

10       A.     Like I said, yes, I've heard of it.

11       Q.     Okay.  But you didn't know it was a

12   company?

13              COURT REPORTER:  Could you say that again?

14   BY MR. STEELE:

15       Q.     You didn't know that it was a company?

16       A.     I guess, maybe I assumed it was.  I don't

17   know.  I haven't given it much thought.

18       Q.     Oh, all right.  During your time as

19   administrator at The Healthcare Resort of Shawnee, what

20   was your understanding of what the relationship was

21   between the Ensign Group, Inc. and The Healthcare

22   Resort of Shawnee Mission?

23              MR. CLARK:  Objection to form.  Lacks

24   foundation.  You can answer it, if you can.

25              THE WITNESS:  There was no relationship.

1  The only relationship we had was with Ensign Services.

2  BY MR. STEELE:

3      Q.    So you were the administrator during your

4  time at The Healthcare Resort of Shawnee.  When you

5  were overseeing the operation of the entire facility,

6  your understanding was that there was no relationship

7  between the Ensign Group, Inc. and The Healthcare

8  Resort of Shawnee?

9      A.    Say that again.  Sorry.  I couldn't quite

10  hear you.

11      Q.    Sure.  So during your time as administrator

12  at the Healthcare Resort of Shawnee, you told me that

13  you were responsible for the operations of the skilled

14  nursing facility; correct?

15      A.    Yes.

16      Q.    Okay.  During your time as administrator at

17  The Healthcare Resort of Shawnee, you also told me that

18  your understanding was that there was no relationship

19  between the Ensign Group, Inc. and the Healthcare

20  Resort of Shawnee; is that accurate?

21          MR. CLARK:  Asked and answered.  You can

22  answer it again.

23          THE WITNESS:  Like I said, no relationship.

24  BY MR. STEELE:

25      Q.    Who is Soon Burnam, B-u-r-n-a-m?

1        A.     Soon is a resource for Ensign Services.  I

2   think she -- she does a lot of work for licensure, I do

3   believe.

4        Q.     Who is Michael Clegg, C-l-e-g-g?

5        A.     Michael Clegg was an administrator.  I

6   think he was actually out in -- in Nebraska.  I'm

7   trying to recall.  I'm not sure.

8        Q.     Who is -- Who is Beverly Wittekind,

9   W-i-t-t-e-k-i-n-d?

10        A.     Beverly Wittekind is at -- is Ensign

11   Services as well.

12        Q.     What -- What's her position there?

13        A.     Oh, she's in legal.

14        Q.     Okay.  Did you have any interaction with

15   her during your time as administrator at The Healthcare

16   Resort of Shawnee?

17        A.     Not when I was at The Healthcare Resort of

18   Shawnee, no.

19               MR. STEELE:  Brett, do you have copies of

20   the code of conduct yet?

21               MR. CLARK:  I don't know the answer to that

22   question.  Let's go off record.

23               VIDEOGRAPHER:  Going off record at 9:04

24   a.m.

25               (Off the record.)

1           THE COURT:  Going back on record at

2  9:06 a.m.

3           MR. CLARK:  He's got the documents in front

4  of him.

5           MR. STEELE:  Okay.

6  BY MR. STEELE:

7      Q.    During your time as administrator at the

8  Healthcare Resort of Shawnee, if you wanted to make a

9  capital improvement, buy a new dishwasher or something

10  like that, did you have to ask anyone for approval?

11      A.    No.  You had a -- I had a budget.

12      Q.    What if it was outside the budget?

13      A.    Then we would go to the other

14  administrators in the market and -- and the market

15  leader.  And they would tell us whether we could do it

16  or not, but I never had the need to do so.

17      Q.    So that wasn't something that Ensign

18  Services had to approve?

19      A.    No, not -- not that I recall.

20      Q.    All right.

21           MR. STEELE:  Will the court reporter mark

22  that code of conduct document as Exhibit 1, please?

23           (Exhibit No. 1 marked.)

24  BY MR. STEELE:

25      Q.    Have you ever seen this document?

1          A.     No, I've never had a hard copy of it.  Some

2  of it looks familiar, but not like this.  No.

3          Q.     Well, let me ask it this way; did you ever

4  receive a code of conduct from anyone during your time

5  as administrator at The Healthcare Resort of Shawnee?

6          A.     We had to go through on -- the online

7  portion for a code of conduct, but it --

8          Q.     Did you recieve --

9          A.     -- I don't recall it being this.

10          Q.     Did you receive -- I'm sorry.  Go ahead.

11          A.     No.  I was saying we had to go online, as

12  I'd previously stated, log on and go through a code of

13  conduct.  I'm just saying, I don't recognize it, but --

14  this specific -- I'm saying it was different than this.

15  And I didn't get a copy like this.

16          Q.     Oh, no.  No.  I understand.  That first

17  line there on the first page, "We are proud to be

18  affiliated with the Ensign Group, Inc."

19                 Did I read that right?

20          A.     I don't -- Where?

21          Q.     It's actually I guess on the -- The first

22  page is titled "Code of Conduct."  The second page is

23  the "Table of Contents" and the third page is

24  "Welcome."  And it says on that third page, "We are

25  proud to be affiliated with the Ensign Group, Inc. "

```
 1              Did I read that right?
 2       A.    I still can't see it.  I apologize.  Third
 3  page?  Oh, "We are proud to be affiliated" -- Oh, yeah.
 4  I see it now.
 5       Q.    All right.  But you don't know what
 6  relationship, if any, the Ensign Group, Inc. had with
 7  The Healthcare Resort of Shawnee during your time as
 8  administrator; is that right?
 9       A.    That's correct.
10       Q.    Go to page 4.  It's titled "Resolving and
11  Reporting Compliance Issues."
12       A.    Four?  Okay.
13       Q.    At the top there it says, "The main purpose
14  of our Compliance Program is to educate.  Our Service
15  Center has assembled a team of compliance experts, the
16  Compliance Team, to lead and support us in this effort.
17  The Compliance Team is comprised of professionals in
18  nursing, therapy, billing, MDS, legal and human
19  resources related matters."
20              Did I read that right?
21       A.    Yes.
22       Q.    Do you know who the "Service Center" that
23  is being referred to in this document is?
24              MR. CLARK:  Objection to form.  Lacks
25  foundation.  You can answer it, if you can.
```

1           THE WITNESS:  Yeah.   The Service Center is

2   Ensign Services.

3   BY MR. STEELE:

4       Q.    Okay.

5       A.    That's our office.

6       Q.    And -- And does -- Ensign Ensign Services

7   also have a compliance team?

8           MR. CLARK:  Objection to form.  You can

9   answer, if you can.

10          THE WITNESS:  Yes.  They have a compliance

11  team.

12  BY MR. STEELE:

13      Q.    And so is it accurate then that the

14  compliance team is comprised of professionals in

15  nursing, therapy, billing, MDS and human resources

16  related matters?

17      A.    Yes.

18      Q.    And those were the types of people that you

19  said that you would from time to time see in your

20  building when you were the administrator if you needed

21  assistance with some matter?

22      A.    I don't think I said that.  I could be

23  wrong, but I don't think I ever said I'd see them from

24  time to time.

25      Q.    Okay.  Let me ask it again then.  Who from

1   Ensign Services, if anyone, ever came to visit your

2   building during your time as administrator at The

3   Healthcare Resort of Shawnee?

4        A.    I really can't remember, but I know there

5   were several folks that did come to help.

6        Q.    What was their role, those people that

7   visited?  Were they nursing?  Were they billing, HR?

8        A.    I -- I do recall, like you mentioned, that

9   HR came by.  We'd requested some help.  Again, all

10  these folks provided back-of-the-house services.  They

11  would help guide and direct our staff, you know?  If

12  you were in -- If you had needs in nursing, you would

13  contact, and they would give you guidance.  They didn't

14  provide services -- but they -- direct services, but

15  they did provide guidance and back-office help.

16            So I'm sure we had folks from HR.  And I'm

17  sure I had some from business office and therapy as

18  well.  I'm sure they were there.  I just can't recall

19  who and when and what times.  It was just too long ago.

20       Q.    So you just said that they didn't provide

21  services.  They, being Ensign Services, but they

22  provided help.  Is that -- Is that what you just said?

23       A.    Yes.  That's accurate.

24       Q.    Are you aware that Ensign Services received

25  5 percent of the gross revenue from The Healthcare

1    Resort of Shawnee during your time as administrator?

2         A.    Yes.

3         Q.    But they weren't providing any services?

4         A.    They were providing back-of-the-house

5    services.  What I probably should clarify -- I

6    apologize -- is they didn't provide any direct care.

7    They provided back-office services.

8         Q.    In exchange for 5 percent of the gross

9    revenue?

10        A.    Correct.

11        Q.    Did you ever receive any training on

12   compliance policies and procedures?

13        A.    Yes.  We had the online training that I had

14   to go through.

15        Q.    And that was regarding compliance policies

16   and procedures; is that accurate?

17        A.    Correct.

18        Q.    Were you aware that there was an Ensign

19   compliance hotline?

20        A.    Yes.  Ensign Services provides that.  Well,

21   actually, I think it's an outside company that manages

22   the hotline, if I recall correctly.

23        Q.    Did you ever receive any training or

24   receive a copy of an employee handbook during your time

25   as nursing home administrator at the Healthcare Resort

1  of Shawnee?

2      A.    I do not think I received an employee

3  handbook at that point.  I -- I remember signing some

4  paperwork and doing some things.  I can't recall.

5      Q.    Have you ever seen an employee handbook in

6  your time as nursing home administrator at The

7  Healthcare Resort of Shawnee or in your -- any of your

8  various roles at Ensign Services?

9      A.    Yes.  I have seen an employee handbook.

10      Q.    What's in it?

11      A.    I can't recall.

12      Q.    You can't recall anything about what's in

13  the employee handbook?

14            MR. CLARK:  Objection.  Asked and answered.

15  You can answer it again.

16            THE WITNESS:  I mean, I could make little

17  piece and bits.  I couldn't -- You know, it's a

18  handbook.  I'm sorry.

19  BY MR. STEELE:

20      Q.    I understand.  I just asking what your

21  recollection is of what is contained in it.

22      A.    Code of conduct, you know, general things

23  that are in the handbook, I guess.  I'm -- I don't -- I

24  don't remember recalling --

25      Q.    Did you --

1       A.      -- anything specific.

2       Q.      I'm sorry.  Go ahead.

3       A.      No.  I just -- I'm just saying it's an

4  outline of, you know, a code of conduct.  And then, you

5  know, I really -- I apologize.  No.  I can't really

6  recall much in it.

7       Q.      So the employee handbook then outlined a

8  code of conduct that the employees at The Healthcare

9  Resort of Shawnee were required to follow?  Is that

10 your recollection?

11      A.      As best as I can, yeah.

12      Q.      Okay.  If you go to page 7 of Exhibit 1,

13 it's titled "Our Expectations Of You."

14      A.      Okay.

15      Q.      And -- And in the top right corner it says,

16 "Always Follow Our Policies and Procedures."  And it

17 says, "We adopted certain policies and procedures to

18 instruct you on how to deliver care and to properly

19 create and maintain accurate medical and financial

20 records.  You are expected to be familiar and comply

21 with these standards, without exception."

22              Did I read that right?

23      A.      You did.

24      Q.      Okay.  And do you know who the "we" is that

25 is referenced on page 7 of Exhibit 1?

1           MR. CLARK:  Objection.  Lacks foundation.

2   He's already said he doesn't -- not familiar with this

3   document.  You can answer, if you can.

4           THE WITNESS:  I mean, this document is

5   before I was even hired at the Ensign Services, 2013.

6   I didn't join until '14, but I couldn't tell you who

7   "we" is.  I know at our facility we adopted our own

8   policies.

9   BY MR. STEELE:

10       Q.    Who wrote this?

11       A.    The different department heads would

12   actually have -- who help write all those.  When I

13   arrived at the facility --

14       Q.    Did you --

15           MR. CLARK:  He --

16   BY MR. STEELE:

17       Q.    Go ahead.

18       A.    When I arrived at the facility, a lot of

19   policies were all -- most of the policies were all in

20   place.  But as we saw a need, we would adopt our own

21   policies and create our own policies.  And all the

22   policies at that facility were adopted and created by

23   that facility.

24       Q.    How do you know that?

25       A.    Because I had been in Kansas prior to that

1  with Ensign Services.

2        Q.    So what did your role at Ensign Services

3  have to do with the adoption of policies and procedures

4  at The Healthcare Resort of Shawnee?

5        A.    It --

6              MR. CLARK:  Objection to form.  You can

7  answer it, if you can.

8              THE WITNESS:  It didn't.  I just witnessed

9  it.

10 BY MR. STEELE:

11       Q.    So you witnessed the different department

12 heads write out the complete set of policies and

13 procedures that were in place at The Healthcare Resort

14 of Shawnee during your time as administrator?

15             MR. CLARK:  Objection to form.

16 Argumentative.  Asked and answered.

17             You can answer it again, if you can.

18             THE WITNESS:  I didn't witness all of it.

19 As I stated, I did witness them write their own

20 policies in specific instances and cases.

21 BY MR. STEELE:

22       Q.    And who is "them"?

23       A.    It would have been a DON.  It would have

24 been the ED at the time.  It would be a rehab director,

25 a business office manager.

 1          Q.    And what time period is this?

 2          A.    That would have been in early 2017.

 3          Q.    Okay.

 4                MR. STEELE:  I don't think I have any more

 5    questions, Mr. Washburn.  Thank you for your time.

 6                THE WITNESS:  Oh.

 7                MR. CLARK:  Shannon, do you have anything?

 8                MR. STEELE:  No.  I got nothing.

 9                MR. CLARK:  Okay.  Let's take a quick

10    break.  I might have just a couple.

11                THE COURT:  Going off record at 9:22 a.m.

12                (Recess was taken.)

13                MR. CLARK:  E-tran.

14                COURT REPORTER:  Did you want a copy?

15                MS. RULO:  Yes.  E-tran.

16                VIDEOGRAPHER:  Going back on record at 9:28

17    p.m. -- I mean, a.m.

18                MR. CLARK:  We have no questions at this

19    time.  We will read and sign.

20                VIDEOGRAPHER:  This concludes the

21    deposition of Laird Washburn.  We are going off record

22    at 9:29 a.m.

23                (Concluded at 9:28 a.m.)

24

25

```
 1   Case: GENE FINKE vs THE ENSIGN GROUP, INC. et al
     Civil No: 2:19-cv-02056
 2   Reported by: Abigail D.W. Johnson, RPR, CRR, CRC
     Date Taken: February 7, 2020
 3

 4                   WITNESS CERTIFICATE
           I, LAIRD WASHBURN, HEREBY DECLARE:
 5
            That I am the witness in the foregoing
 6   transcript; that I have read the transcript and know
     the contents thereof: That with these corrections, I
 7   have noted this transcript truly and accurately
     reflects my testimony.
 8

 9   PAGE-LINE        CHANGE-CORRECTION              REASON
     _____    _____    _____
10   _____    _____    _____
     _____    _____    _____
11   _____    _____    _____
     _____    _____    _____
12   _____    _____    _____
     _____    _____    _____
13   _____    _____    _____
     _____    _____    _____
14   _____       No corrections were made.

15           I, LAIRD WASHBURN, deponent herein, do hereby
     certify and declare under penalty of perjury the within
16   and foregoing transcription to be true and correct.

17

18       _____
                   LAIRD WASHBURN, Deponent

19           SUBSCRIBED and SWORN to at _____
     _____, this _____day of _____ , 20       .
20

21                   _____
                          Notary Public
22

23

24

25
```

```
 1                       REPORTER'S CERTIFICATE
 2   STATE OF UTAH        )
                          )
 3   COUNTY OF SALT LAKE  )

 4              I, ABIGAIL D.W. JOHNSON, a Certified

 5   Shorthand Reporter and Registered Professional

 6   Reporter, hereby certify:

 7              THAT the foregoing proceedings were

 8   taken before me at the time and place therein set

 9   forth, at which time the witness was placed under oath

10   to tell the truth, the whole truth, and nothing but the

11   truth; that the proceedings were taken down by me in

12   shorthand and thereafter my notes were transcribed

13   through computer-aided transcription; and the foregoing

14   transcript constitutes a full, true, and accurate

15   record of such testimony adduced and oral proceedings

16   had, and of the whole thereof.

17              I FURTHER CERTIFY that I am not a

18   relative or employee of any attorney of the parties,

19   nor do I have a financial interest in the action.

20              I have subscribed my name on this

21   15th day of February, 2020.

22

23   _____

24        ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

25
```